# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7050 | **DATE** | November 18, 2003 |
| **CASE TITLE** | Illinois Bell Telephone Co v. Wright et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION granting in part and denying in part Ameritech's motion for summary judgment [   ].

(11) x [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | | |
| | No notices required. | | | | |
| x | Notices MAILED by judge's staff. | | NOV 20 2003 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | 38 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to _____ | | date mailed notice | | |
| KAM | courtroom deputy's initials | | KAM | | |

U.S. DISTRICT COURT
CLERK

03 NOV 20 AM 3:32

FILED FOR DOCKETING

Date/time received in central Clerk's Office

mailing deputy initials

(Reserved for use by the Court)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE COMPANY<br>d/b/a AMERITECH ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KEVIN K. WRIGHT, RUTH KRETSCHMER,<br>EDWARD HURLEY, TERRY HARVILL, and<br>MARY FRANCES SQUIRES,<br>Commissioners of the Illinois<br>Commerce Commission, in Their<br>Official Capacities, | ) | No. 00 C 7050 |
| | ) | |
| Defendants. | ) | |

DOCKETED

NOV 2 0 2003

## MEMORANDUM OPINION

Before the court is Ameritech's motion for summary judgment. For the following reasons, the motion is granted in part, and denied in part.

## BACKGROUND

Plaintiff Illinois Bell Telephone Company d/b/a Ameritech Illinois ("Ameritech") brings this action pursuant to the Telecommunications Act of 1996, 47 U.S.C. §§ 151 et seq. ("TCA" or the "Act") against the individual commissioners of the Illinois Commerce Commission ("ICC" or "Commission") in their official capacities (collectively, "defendants"). Ameritech seeks judicial review of an ICC decision rendered on August 15,

38

2000 ("ICC Order" or "Order"). The ICC is the state agency responsible for, among other things, both the general supervision of telecommunications carriers and the regulation of telecommunications service in Illinois. The ICC Order held, principally, that Ameritech imposed certain network-access costs upon its competitors in an unlawful manner. In this action, Ameritech argues that the Order violates federal telecommunications law, including the TCA, and seeks to enjoin the enforcement of the alleged unlawful aspects of the Order.

## A.     The Telecommunications Act of 1996

An understanding of Ameritech's claims requires a healthy grasp of the purpose and structure of the Act and its implementing regulations, which, to say the least, can be somewhat elusive. See AT&T Corp. v. Iowa Utilities Board, 525 U.S. 366, 397, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) ("It would be gross understatement to say that the 1996 Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed self-contradiction.")

Prior to the TCA's enactment in 1996, the local telephone service market was regulated as a natural monopoly by state utility commissions. Generally, a single company, called a local exchange carrier ("LEC"), provided telephone service to a particular area. Protected by state anti-competition laws, these

LECs built comprehensive local telephone service networks which constitute much of the present-day national telecommunications infrastructure.

The TCA was enacted to deregulate these local telephone service monopolies and facilitate competition. See TCA Preamble, Pub.L.No. 104-104, 110 Stat. 56 (1996) (Congress passed the Act "to promote competition and reduce regulations in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."). The Act preempted the state laws which theretofore had insulated LECs from competition. See 47 U.S.C. § 253(a). Congress recognized, however, that merely removing the legal barriers to market entry would be insufficient to open up a truly competitive market. Simply, it would be economically impractical for would-be competitors to replicate for their own customers the network infrastructure already in place. As a solution, the Act imposes on Incumbent Local Exchange Carriers ("ILECs"), the companies who held the monopolies (here, Ameritech), "a host of duties intended to facilitate market entry" by Competing Local Exchange Carriers ("CLECs"), the companies seeking to provide competing services. See Iowa Utilities Board, 525 U.S. at 371-72. These duties, codified at 47 U.S.C. §§ 251 and 252, comprise the TCA's entire

substantive and procedural framework for local telephone service competition.

Under section 251, an ILEC is required to enter into an "interconnection agreement" with a requesting CLEC. See 47 U.S.C. § 251(c)(1). The agreement must provide for one of the following methods of competition: first, for the rare CLEC that already has its own local telephone network, an ILEC must provide the CLEC with "interconnection" to its (the ILEC's) network, (see 47 U.S.C. § 251(c)(2)); second, for a CLEC seeking to acquire a network by leasing all or part of the ILEC's network, an ILEC must provide access to its own "network elements" such as loops, switching capability, and other components on an individual, or more technically, "unbundled," basis (unbundled network elements are called "UNEs") (see id. § 251(c)(3)); third, for a CLEC planning simply to resell an ILEC's telecommunications services at retail prices, the ILEC must sell its retail services to the CLEC at wholesale prices. See id. § 251(c)(4). Under any of these three competition models, an ILEC must provide access to CLECs on a "nondiscriminatory" basis. See id. §§ 251(c)(2)(D), (c)(3), and (c)(4)(B).[1]

---

[1] The Act also details the procedural requirements necessary for a CLEC to gain access to an ILEC's network facilities. First, the CLEC must make a request to the ILEC for access to its network. Next, the CLEC and ILEC are required to negotiate in good faith the

This case involves the second competition model – the provision of UNEs to CLECs. We tailor our discussion accordingly. The TCA empowers the Federal Communications Commission ("FCC") to implement the statute's local competition provisions; the FCC has undertaken this charge through a series of regulations and orders. Of particular significance here, the TCA specifically directs the FCC to determine which UNEs an ILEC must provide to a CLEC, and to establish a regulated pricing methodology for such UNE provisions. See id. § 251(d). In August 1996, the FCC issued its initial order which, among other things, addressed these two mandates. See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, CC Docket No. 96-98, 11 FCC Rcd 15499 (Aug. 8, 1996) ("Local Competition Order").

In its Local Competition Order, the FCC established a list

---

terms (including price) of the interconnection agreement. See 47 U.S.C. § 251(c)(1). The parties then submit the final interconnection agreement to the appropriate state utility commission (here, the ICC) for approval. See id. § 252(e)(1). If the parties are unable to reach a final agreement (which is often the case), either party may petition the commission to arbitrate the contested issues. See id. § 252(b). Either way, once the agreement is final, the Act gives the commission the authority to interpret and enforce agreements when post-approval disputes arise. See id. §§ 252(c), (e)(1) and (e)(2). The commission is charged with ensuring that the agreements comply with the Act, and of particular relevance to this case, that negotiated UNE rates comply with the pricing methodology for network elements. See id. §§ 252(c)(1) and (c)(2).

of UNEs that ILECs nationwide are required to make available to CLECs. <u>See</u> 47 C.F.R. § 51.319. In addition to other UNEs, the FCC required ILECs to lease "local loops." <u>See</u> <u>id.</u> § 51.319(a)(1). A local loop consists of the transmission facilities that connect a customer's premises (such as a home or business) to the ILEC's "central office," where calls are then directed, or "switched," to their destination. <u>See</u> <u>id.</u> Significantly, the FCC's requirement that Ameritech lease local loops applies to both "integrated" and "unintegrated" facilities. <u>See</u> <u>Local Competition Order</u>, ¶¶ 383-84 (<u>See</u> <u>discussion</u>, Section B.1., <u>infra.</u>). The FCC also required ILECs to take affirmative steps to upgrade, or "condition," existing loop facilities to enable CLECs to provide services, such as digital subscriber line ("DSL") service, not already provided over loop facilities. <u>See</u> 47 C.F.R. § 51.319(a)(1)(iii); <u>see also</u> <u>Local Competition Order</u>, ¶ 382.

Turning to the pricing methodology governing the provision of UNEs, the TCA provides the FCC with some, albeit minimal, guidance: the price for UNEs "shall be . . . based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the . . . network element" and "may include a reasonable profit." 47 U.S.C. §§ 252(d)(1)(A) and (d)(1)(B). The FCC has since established that a state utility

commission must set the price for a UNE based on that element's forward-looking Total Element Long-Run Incremental Cost ("TELRIC"). <u>See</u> <u>Local Competition Order</u>, ¶ 672. Under this TELRIC formula, UNE costs are "based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the [ILEC's] wire centers." 47 C.F.R. § 51.505(b)(1). In other words, TELRIC calculates cost by reference to an "ideal world" most-efficient UNE (not the actual UNE being provided), but located at an ILEC's "real world" existing facilities. "TELRIC is not a specific formula, but a framework of principles that govern pricing determinations." <u>AT&T Corp. v. FCC</u>, 220 F.3d 607, 615 (D.C. Cir. 2000). Thus, in applying the TELRIC formula, state commissions retain the flexibility to consider "local technological, environmental, regulatory, and economic conditions." <u>Local Competition Order</u>, ¶ 114.[2]

---

[2]     The FCC's rules regarding both the provision and pricing of UNEs have not come easily. With respect to UNE provision, the Supreme Court, in <u>Iowa Utilities Board</u> vacated portions of the <u>Local Competition Order</u>, finding that the FCC's general approach to determining which network elements must be provided was overly broad. <u>See</u> 525 U.S. 366, 390. ("[If] Congress had wanted to give blanket access to incumbents' networks," it "would simply have said (as the [FCC] in effect has) that whatever requested element can be provided must be provided."). Following <u>Iowa Utilities Board</u>, the FCC issued a new report in which it revised its criterion for

## B.   The ICC Proceedings

Having set out the relevant regulatory framework, we turn to the ICC proceedings.  On November 3, 1999, the ICC initiated an investigation into Ameritech's policies governing certain "special construction" charges it imposes upon CLECs which seek to lease UNEs.  The stated goal of the investigation was to determine "whether Ameritech is applying special construction charges in a discriminatory or preferential manner with regard to its retail customers and [CLECs] purchasing [UNEs]."  Typically, Ameritech's costs incurred in providing UNEs are recovered *via*

---

determining which network elements ILECs would be required to unbundle, but more importantly here, it reaffirmed the more narrow principles set forth in the text.  See Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Third Report and Order and Fourth Further Notice of Proposed Rulemaking, 15 FCC Rcd 3696 (Nov. 5, 1999) ("UNE Remand Order").  We note that the District of Columbia Circuit has since remanded the UNE Remand Order for reconsideration of an issue unrelated to this case.  See United States Telecom Ass'n v. FCC, 290 F.3d 415 (D.C. Cir. 2002).

Iowa Utilities Board also addressed the FCC's rules governing UNE pricing.  The Court reversed the Eighth Circuit's holding that sections 252(c)(2) and (d) give state utility commissions exclusive authority to make pricing decisions under the Act, and thus deprive the FCC of any rulemaking power in that area.  See Iowa Utilities Board, 525 U.S. at 385 ("[T]he [FCC] has jurisdiction to design a pricing methodology" to "guide the state-commission judgments.").  The Court therefore remanded to the Eighth Circuit the substantive challenges to the FCC's pricing rules that remained undecided.  On remand, the Eighth Circuit invalidated the FCC's TELRIC rate-setting principle.  See Iowa Utilities Board v. FCC, 219 F.3d 744 (8th Cir. 2000).  The Supreme Court subsequently reversed, upholding the FCC's TELRIC pricing model.  See Verizon Communications, Inc. v. FCC, 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002).

its monthly TELRIC-based, or "recurring," rates.    However, Ameritech levies special construction, or "non-recurring," charges when it determines that a loop, or a portion of the loop, is "available" but cannot be provided, or a service necessary to its provision cannot be performed, without additional network construction.    The ICC's investigation focused on two types of special construction charges imposed by Ameritech: (i) charges when a CLEC requests access to an unbundled loop served by an "integrated facility;" and (ii) charges when a CLEC requests that a loop be "conditioned" to allow for advanced data transmission services.    Before addressing the ICC's holdings, and Ameritech's challenges thereto, we briefly discuss the technical background to both "unbundling" and "loop conditioning."

### 1.    Unbundling Loops Served By Integrated Facilities

The UNE known as a "local loop" actually comprises three cables (each called a "loop element") and links a customer's premises, through an Ameritech wire center, to Ameritech's central office, thereby providing each customer with access to Ameritech's network and its connections to the worldwide telecommunications network.[3]    Historically, and still in a

---

[3]    The three "loop elements" are: (i) a feeder cable that runs from the central office (either the main distribution frame or a digital switch, depending on the technology used) to the serving area interface ("SAI"), which cross-connects the feeder and the

majority of cases, each customer's transmissions are relayed over a single copper loop which runs from the customer's premises to the central office. One loop is allocated to one customer, and *vice versa*. Under this setup, Ameritech usually can provide an individualized, or "unbundled" loop to a requesting CLEC without significant work, in which case the CLEC is not charged any special construction charges, but only the standard TELRIC-based price for leasing the loop. For example, if a customer changes service from Ameritech to a CLEC, and that CLEC seeks to lease the same loop Ameritech had used to serve that customer, in most cases Ameritech need only disconnect the loop from its switch, located at its central office, and cross-connect it to the CLEC's switch, also located at Ameritech's central office.

However, in a minority of service areas served by "integrated facilities," certain loop transfers are more labor intensive, and therefore more expensive. In an effort to achieve greater efficiency than that offered by the conventional one customer-one loop model, advances in digital transmission technology have allowed providers to electronically "integrate"

---

distribution cable, (ii) a distribution cable that runs from a SAI to a pedestal or distribution terminal adjacent to the customer premises, and (iii) a drop cable that runs from the pedestal to the customer premises, and which terminates in a network interface device. <u>See</u> <u>ICC Order</u>, at 3.

loops using integrated digital loop carrier ("IDLC") systems. Under an IDLC system, several loops running from different customer premises meet at a single intermediate transmission facility known as a Remote Terminal ("RT"). From the RT, the loops are joined to form a single integrated high-speed digital path to the central office. At the RT, the analog signals on each of the copper loops are converted to digital signals and then "integrated" onto a single facility for its remaining trip to the central office. Under an IDLC system, then, where the loops arrive at the central office as part of an integrated path (consisting of several loops that do not each have their own separate physical connection to Ameritech's switch), providing a CLEC with an unbundled loop is not as simple as disconnecting and re-connecting a loop at Ameritech's central office. As the FCC has stated, "competitors generally cannot access IDLC loops at the incumbent's central office." See UNE Remand Order, at ¶ 217.

Therefore, in order to provide an unbundled loop in an area where the existing loops are "integrated" via an IDLC system, Ameritech must "unbundle" or, more technically, "disaggregate," the requested loop from the integrated path. In some cases, this is done by adding a "plug-in" card at the RT or the central office, or, if available, utilizing a spare non-integrated loop element that runs parallel to the integrated path from the RT to

the central office. In other cases, if service is provided to a different customer on a parallel non-integrated loop, Ameritech can transfer that customer to an IDLC system, thus freeing up the non-integrated loop for provision to the CLEC (a process known as a "line and station transfer"). Ameritech does not impose special construction charges in any of these situations. However, if these options are unavailable, Ameritech must design and install a new, non-integrated loop transmission facility (which typically requires installation of a new RT or a new central office terminal ("COT")) in order to provide the requesting CLEC with an unbundled loop. In such a case, Ameritech imposes special construction charges upon CLECs for the costs Ameritech incurs in providing the unbundled loop.

In addition to IDLC systems, some integrated facilities' loops are served *via* a Remote Switching Unit ("RSU"). An RSU is essentially a "mini-switch" located between the customer's premises and the central office. Like an IDLC system, an RSU integrates the analog signals from many copper loops onto one facility that carries the integrated signals to a host switch at the central office. Unlike an IDLC system, an RSU also provides certain switching functions. Important here, similar to the problem posed by some IDLCs, an individual loop cannot be disaggregated from the integrated path that runs from the RSU to

the central office. Instead, Ameritech must provide a non-integrated transmission path (called an "umbilical") from the RSU to the central office. Here too, Ameritech seeks to recover from the requesting CLEC, through special construction charges, the costs associated with providing the new transmission path.

## 2. Loop Conditioning

Most of Ameritech's loops were built to carry voice traffic. A CLEC, or Ameritech, may seek to use those same loops to provide more advances services, such as DSL service, to their respective retail customers. To do so, the standard loops must be upgraded, or "conditioned." "Loop conditioning" involves removing from a loop certain devices (e.g., bridge taps, low-pass filters, range extenders) that improve voice transmission, but may interfere with that loop's advanced services capabilities. See 47 C.F.R. § 51.319(a)(1)(iii). Ameritech also seeks recovery of its loop conditioning costs from CLECs through special construction charges.

## 3. The ICC Decision and Ameritech's Present Claims

As part of its investigation, the ICC held three days of trial-type evidentiary hearings before a Commission Hearing Examiner. In addition to Ameritech and ICC Staff, several CLECs were granted leave to intervene in the proceedings. All parties filed post-hearing briefs. The Hearing Examiner then issued a

Proposed Order. Following the Proposed Order, all parties were afforded an opportunity, which several took, to file written objections, and responses thereto. On August 15, 2000, the ICC issued its 101-page single-spaced final Order.

Relevant here, the ICC first held that Ameritech is not entitled to recover any separate charges for installing new facilities to provide an unbundled loop in an integrated system. The ICC explained that "Ameritech's assessment of special construction charges for such [facilities] would constitute double recovery," because "the average costs of acquiring, installing, and maintaining these facilities necessary to provision an unbundled loop are already included in Ameritech's TELRIC rates." Second, the ICC concluded that Ameritech's assessment of loop conditioning costs on CLECs is discriminatory because Ameritech recovers those same costs in a different manner from its direct retail service customers. Third, the ICC ordered Ameritech to expand its definition of when a facility is deemed "available" for purposes of providing a CLEC with a requested UNE. Finally, the ICC required Ameritech to provide a price quote for any special construction work within 48 hours of receiving a request for an unbundled loop.

Ameritech contends that these first three holdings infringe upon its rights under the TCA and the FCC's implementing

regulations. The fourth holding, Ameritech claims, violates its rights to procedural due process guaranteed by the Fourteenth Amendment.

## JURISDICTION

At the outset, we are presented with a challenge to our jurisdiction to hear this case. Ameritech asserts two bases for this Court's jurisdiction to review the ICC Order for compliance with federal law, 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331. Defendants object, arguing first that the TCA's specific grant of jurisdiction at section 252(e)(6) is, by its terms, limited to a review of state commission orders that interpret or enforce an interconnection agreement, something the ICC Order does not do. See 47 U.S.C. § 252(e)(6). As for this Court's jurisdiction under section 1331, defendants seem to argue that Congress, by expressly limiting the subject matter of a federal court's review at section 252(e)(6), also intended that section to provide the exclusive grant of jurisdiction.

Our analysis begins, and ends, with this Court's section 1331 jurisdiction. Contrary to defendants' position, as the Supreme Court has made clear, "nothing in 47 U.S.C. § 252(e)(6) purports to strip [section 1331] jurisdiction." See Verizon Maryland, Inc. v. Publ. Serv. Comm'n of Maryland, 535 U.S. 635, 643, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). Under section

1331, federal courts have jurisdiction to review state commission
orders when "resolution of the [plaintiff's] claim turns on
whether the Act, or an FCC ruling thereunder, precludes the
[state] Commission" from issuing the order. Id. Thus, because
section 1331 provides this Court with all the jurisdiction it
needs to review the ICC Order for compliance with federal law, we
decline to resolve whether Ameritech's claims fall within the
jurisdictional grant conferred by section 252(e)(6).

## STANDARD OF REVIEW[4]

In reviewing the ICC Order, we review *de novo* the
Commission's interpretations of federal law. See Michigan Bell
Tel. Co. v. Strand, 305 F.3d 580, 586 (6th Cir. 2002). Moreover,
because the Commission is a state agency, "[its] interpretation
of federal statutes is not entitled to the deference afforded a
federal agency's interpretation of its own statutes under
Chevron." Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1495 (9th
Cir. 1997).[5]

---

[4]     Although Ameritech has styled its pleading as a motion for
summary judgment pursuant to Fed.R.Civ.P. 56, and defendants have
responded in kind, a motion seeking judicial review of the
Commission's final administrative decision is more properly treated
as a motion for an order reversing the Commission's decision.

[5]
     By contrast, the Court gives the FCC's interpretation of the
TCA substantial deference. See Smiley v. Citibank (South
Dakota),N.A., 517 U.S. 735, 739-42, 116 S.Ct. 1730, 135 L.Ed.2d 25
(1996); Chevron, U.S.A., Inc. v. National Resources Defense

As for the ICC's findings of fact, we apply the "arbitrary and capricious" standard of review. See, e.g., Michigan Bell, 305 F.3d at 586; Southwestern Bell Tel. Co. v. Public Utilities Comm'n, 208 F.3d 475, 481-82 (5th Cir. 2000); US West Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1117, 1124 n. 15 (9th Cir. 1999).[6] "The 'arbitrary or capricious' standard of review is a deferential one which presumes that agency actions are valid as long as the decision is supported by a 'rational basis.'" Pozzie v. United States Dept. of Housing and Urban Development, 48 F.3d 1026, 1029 (7th Cir. 1995) (citation omitted). This standard, in the context of reviewing the findings of a state utility commission, has been explained as follows:

> Generally, an agency decision will
> be considered arbitrary and capricious
> if the agency had relied on factors which
> Congress had not intended it to consider,
> entirely failed to consider an important

Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

[6] Absent guidance from either the TCA itself or the Seventh Circuit, in adopting the "arbitrary and capricious" standard, we note our agreement with a majority of the federal circuit courts. Standing alone, the Fourth Circuit has applied a "substantial evidence" standard to a state utility commission's findings of fact. See GTE South, Inc. v. Morrison, 199 F.3d 733, 737 (4th Cir. 1999). It explained, however, that with respect to review of factfindings it found no meaningful distinction between the "arbitrary and capricious" standard and the "substantial evidence" standard. See id., 199 F.3d at 745 n. 5.

aspect of the problem, offered an
explanation for its decision that runs
counter to the evidence before the agency,
or is so implausible that it could not be
ascribed to a difference in view or the
product of agency expertise.

Illinois Bell Tel. Co. v. Wright, 245 F.Supp.2d 900, 905 (N.D.
Ill. 2003) (citation omitted). Although we review the entire
administrative record, we do not reweigh the evidence, decide
questions of credibility, and are "not empowered to substitute
[our] judgment for that of the agency." Id. In other words, a
reviewing district court does not "sit as a surrogate public
utilities commission to second-guess the decisions made by the
state agency to which Congress has committed primary
responsibility for implementing the Act." Michigan Bell Tel. Co.
v. Airtouch Cellular, Inc., 2002 WL 551043, at *3 (E.D. Mich.
Mar. 27, 2002). This highly deferential standard is particularly
appropriate when reviewing factual findings made by agencies
pursuant to the TCA, because often those findings are
inextricably tied to the technical, if not idiosyncratic,
specifics of a particular ILEC's network.

## DISCUSSION

We turn, at last, to the merits. As noted above,
Ameritech's first two challenges to the ICC Order concern its
cost recovery policies – first, when it unbundles a loop served

by an integrated facility for use by a CLEC, and second, when it conditions a loop for a CLEC. Next, Ameritech takes issue with the Commission's determination of when Ameritech is required to provide a CLEC with a requested UNE. Finally, Ameritech mounts a due process challenge to the Commission's imposition of a special construction price quote requirement. We address these arguments in turn.

### A. Special Construction Charges – Unbundling Loops Served By Integrated Facilities

There is no dispute that the FCC has expressly authorized ILECs, such as Ameritech, to recover from requesting CLECs the costs of providing unbundled access to loops served by integrated facilities. See Local Competition Order, ¶ 384 ("Commenters identify a number of other methods for separating out individual loops from IDLC facilities, including methods that do not require multiplexing. Again, the costs associated with these mechanisms will be recovered from requesting carriers."). Ameritech claims that the ICC's holding that it may not recover such costs through special construction charges runs headlong into the FCC's mandate allowing recovery.

Properly framed, however, the ICC's holding was not that Ameritech *cannot* recover its "unbundling" costs, but only that it *already does* recover the costs through its standard monthly

TELRIC-based loop prices, and therefore, its assessment of special construction charges constitutes a double recovery. Thus, Ameritech's argument has color only if the ICC was wrong in its determination that Ameritech recovers the "unbundling" costs in its monthly rates. On this score, the ICC's determination is a finding of fact. As such, it will be disturbed only if there is no rational basis to support it. See Pozzie, 48 F.3d at 1029.

Ameritech's first challenge to the ICC's finding is straightforward. It argues that it does *not* include the costs of unbundling a loop from an integrated facility in its monthly prices, period. Based on the record evidence, the ICC, in its Order, set out a comprehensive analysis of the circumstances in which Ameritech assessed special construction charges. In particular, the ICC considered the special construction situation that arises when a CLEC requests an unbundled loop served by an IDLC or RSU facility and Ameritech determines that no spare loops are available. The ICC explained that this situation presents two possible scenarios: either the IDLC/RSU is used with COT technology or it is not used with COT technology. If COT technology is used, loops can be provisioned by using plug-in cards at the RT and COT. If COT technology is not used, loops may be unbundled only by a line station transfer *or by building separate non-integrated facilities*. Under *any* of these

scenarios, the ICC found, Ameritech recovers the unbundling costs through its existing TELRIC-based UNE loop rates, and therefore, permitting Ameritech to assess special construction charges would allow it to recover these costs twice. Specifically, regarding the situation when Ameritech must supply new non-integrated facilities, the only circumstance in which Ameritech imposes special construction charges, the ICC found:

> If an available unbundled loop may only be provisioned via the construction of new non-integrated facilities, the Commission concurs with Staff that such may be done through the acquisition and installation of a COT/RT system. . . . As Staff demonstrated, the average costs of acquiring, installing, and maintaining these facilities necessary to provision an unbundled loop are already included in Ameritech's TELRIC rates. Given that TELRIC rates recover Ameritech's investment in a facility over the life of the facility, Ameritech's assessment of special construction charges for such a COT/RT system would constitute double recovery.

ICC Order, at 63-64.

In arriving at this conclusion, the Commission relied heavily on the record testimony proffered by the ICC Staff. One Staff witness described in detail the TELRIC methodology, the components of a loop, the costs of a loop UNE, and how Ameritech developed its TELRIC rates for a loop UNE. The witness testified

at length regarding the instances in which Ameritech assessed special construction charges, including the situation when a CLEC seeks access to a loop served by an IDLC or RSU facility and no spare loops are available. The witness testified regarding the different cost components included in Ameritech's recurring and non-recurring TELRIC-based rates for unbundled loops. Significantly, the witness testified that every portion of the unbundled loop facility, *including loops served by IDLCs and RSUs*, has a corresponding cost component included in Ameritech's existing UNE loop rate. This testimony was corroborated by a second Staff witness who stated that allowing Ameritech to recover the costs of unbundling a loop from an integrated facility would allow it to recover its costs twice.

Ameritech's witnesses, on the other hand, testified that its TELRIC cost study, and therefore its monthly rate, did *not* include the costs of installing a new COT or RT system to provide access to a loop served by an integrated facility. Ameritech now contends that the Commission ignored this testimony. This argument is not tenable. A plain reading of the ICC's detailed decision reveals that the Commission amply considered all of the testimony proffered by each party, including Ameritech, fully understood each of the parties' positions, including Ameritech's, and ultimately credited the Staff witnesses' testimony. Further,

this Court's independent review of the administrative record suggests that the Staff testimony accepted by the Commission was both comprehensive and credible. In sum, we have no trouble finding a "rational basis" in the record for the ICC's decision.

Since we find that the ICC fully considered Ameritech's position, Ameritech's remaining challenges amount to a proposal that we reweigh the evidence presented to the ICC and draw a different conclusion. Ameritech misapprehends our role. Under the "arbitrary and capricious" standard, we do not conduct a second investigation, nor do we substitute our judgment for that of the Commission. See Illinois Bell, 245 F.Supp.2d at 905. Rather, we only determine whether the ICC drew a "rational connection between the facts found and the choice made." See Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). That substantial evidence may support a contrary finding, even one that a reviewing court might find more compelling, is insufficient to disturb an agency decision. And here, because the Commission's finding "is [not] so implausible that it could not be ascribed to a difference in view or the product of agency expertise," and because we find sufficient record evidence to support it, the Commission's finding is not "arbitrary or capricious" and is therefore sustained. Illinois Bell, 245

F.Supp.2d at 905.

Ameritech's second argument is less direct. Ameritech asserts that the TELRIC pricing model, which presumes a least-cost, most-efficient hypothetical network, actually *precludes* it from recovering the costs of unbundling a loop from an integrated facility in its monthly prices.[7] As noted above, the FCC's TELRIC-based pricing rules require standard monthly UNE prices (including rates for unbundling loops from integrated facilities) to be based on the forward-looking costs of the network element assuming the use of the most efficient technology currently available. See 47 C.F.R. § 51.505(b)(1). As the starting point for establishing UNE prices, an ILEC develops a TELRIC cost study that identifies the least-cost, most efficient network technology currently available, regardless of what network facilities the ILEC has actually deployed, and then calculates the forward-looking costs of providing a UNE using that technology. See id. § 51.505(e).

Under this framework, Ameritech's "TELRIC argument" begins with the premise that, for purposes of providing unbundled loops,

---

[7] Although Ameritech's "second argument" is perhaps more aptly characterized as simply a second premise for its first argument (*i.e.*, Ameritech does not include the "unbundling" costs in its monthly rates because it cannot, as a matter of law, do so), ease of analysis suggests separate treatment.

a least-cost, most-efficient network would include only *non-*integrated loop facilities because integrated facilities are inefficient for unbundling purposes. Thus, the argument goes, Ameritech's TELRIC cost study for providing loops could not include costs incurred in connection with unbundling a loop from an integrated facility, but only costs associated with providing a loop from "ideal world" non-integrated facilities. Ameritech concludes, then, that since costs of unbundling loops served by integrated facilities could not be (and therefore, are not) recovered *via* monthly TELRIC rates, the ICC Order, by forbidding recovery *via* special construction charges (the only alternative recovery method), contradicts the FCC's express statement that ILECs may recover such costs.

Both parties have treated Ameritech's theory as presenting a neatly-packaged question of federal law ripe for this Court's review – that is, whether the FCC's TELRIC rules prohibit Ameritech from including costs related to integrated facilities in its monthly rates. Resolution of this question, however, presupposes an answer to an antecedent question of fact – which facilities, integrated or unintegrated, constitute the most-efficient, least costly network configuration? And, although the ICC was presented with testimony touching on that issue (see ICC Order, at 46-48, 59-60), it expressly declined to address *any*

argument regarding the network efficiency assumptions underlying Ameritech's TELRIC-based UNE cost studies. See id., at 59 ("To the extent that any party advocates revisions to Ameritech's UNE rates or the assumptions upon which those rates are based, the Commission is of the opinion that this investigation is not the appropriate forum in which to do so. This proceeding was initiated to determine whether Ameritech's application of special construction charges is discriminatory or preferential."). This makes sense. The ICC's ultimate factual finding that Ameritech *does* recover the costs of unbundling loops served by integrated facilities in its TELRIC rates did not require a separate evaluation of whether those rates must be as a matter of law, or even are as a matter of fact, premised on a hypothetical network of unintegrated facilities. Therefore, because Ameritech's "TELRIC argument" fell beyond the purview of the ICC proceedings, it is similarly outside the scope of this Court's review.[8]

Of course, to the extent that the ICC Order encroaches upon

---

[8] In support of its "TELRIC argument," Ameritech represented to the Court that "the ICC Staff *agreed* that the FCC's TELRIC-based pricing rules required Ameritech's loop cost study to exclude costs related to integrated facilities." See Ameritech Br., at 12-13 (emphasis in original). As it turns out, the ICC Staff testimony paraphrased by Ameritech in support of this proposition omitted its all-important qualification "according to Ameritech." This mischaracterization is, at best, a grossly negligent oversight, and what is more probably the case, an attempt to mislead the court.

some federal law, its limited sweep will not save it from judicial review. But here, on either argument, Ameritech does not point to any requirement of federal law which has been compromised by the ICC Order. Specifically, although the FCC rules permit Ameritech to recover its "unbundling" costs, nothing in the TCA or FCC regulations guarantees Ameritech the right to recover those costs *via* special construction charges. Likewise, there is no federal requirement that a TELRIC-based UNE cost study include only non-integrated facilities. Rather, the FCC's TELRIC regulations require that cost studies assume an "ideal world" least-cost most-efficient network. Now, *if* unintegrated facilities constitute that network in this case, and *if* Ameritech's cost studies, in fact, assumed only unintegrated facilities, Ameritech's argument might have some merit. These "if"s, however, are not part of the record before us. Accordingly, contrary to Ameritech's contention, nothing in the ICC's Order contradicts the FCC's order allowing Ameritech to recover the costs of unbundling loops from integrated facilities.[9]

---

[9] Ameritech makes one last argument, in a cursory footnote, that the ICC's decision effectuates an unconstitutional taking "by depriving Ameritech of its property (the costs of the network modifications) without just compensation." Ameritech Br., at 14 n. 6. However, because Ameritech wholly fails to develop its position, we deem the argument waived. See Martin v. Shawano-

### B.    Special Construction Charges – Loop Conditioning

Like "unbundling" costs, it is uncontested that the FCC rules allow Ameritech to recover from a CLEC loop conditioning costs.    See <u>Local Competition Order</u>, ¶ 382 (When an ILEC conditions a loop for a CLEC, that CLEC must "bear the cost of compensating the incumbent LEC for such conditioning."). Therefore, similar to its evaluation of "unbundling" cost recovery, the ICC was not focused on *whether* Ameritech could recover loop conditioning costs, but rather on *how* it was doing so.    There, the Commission concluded that the manner in which Ameritech recovers loop conditioning costs is unlawful under the "nondiscrimination" provisions of the TCA.    Because the ICC's holding hinges on its interpretation of the Act's nondiscrimination requirements – a question of federal law – we review its analysis *de novo*.    See <u>Michigan Bell</u>, 305 F.3d at 586.

The relevant factual record is brief and uncontested.    When a CLEC requests loop conditioning, Ameritech imposes a special construction charge on that CLEC to recover its loop conditioning costs.    On the other hand, when Ameritech conditions a loop for one of its own retail customers, Ameritech generally does not impose a separate charge.    From these facts, the ICC found that

<u>Gresham School Dist.</u>, 295 F.3d 701, 706 n.4 (7th Cir. 2002).

Ameritech's imposition of up-front special construction charges on CLECs seeking loop conditioning constitutes unlawful discrimination because Ameritech's retail customers are not levied a similar up-front charge.[10] By way of remedy, the Commission stated that Ameritech may continue to recover loop conditioning charges from CLECs *via* up-front special construction charges, but only if it imposes similar up-front charges on its retail customers.

The ICC's discrimination holding rests on the foundational premise that federal law requires Ameritech to recover its loop conditioning costs from CLECs in the same manner that it recovers conditioning costs from its retail customers. Ameritech argues, convincingly, that federal law contains no such requirement.

The TCA imposes a duty on all ILECs to provide "nondiscriminatory access to network elements on an unbundled basis . . . on rates, terms, and conditions that are just, reasonable and nondiscriminatory. . . ." See 47 U.S.C. §

---

[10] Ameritech argued before the ICC that, like CLECs, it *does* charge retail customers for loop conditioning, just not through up-front charges. Instead, Ameritech claimed, it recovers its conditioning costs over time, and spread among all its retail customers, through its standard monthly retail rates. The ICC rejected Ameritech's proffer, but held that even if Ameritech does recover loop conditioning costs from retail customers, the undisputed fact that such recovery is not through an up-front charge still rendered its loop conditioning policies discriminatory.

251(c)(3). The FCC has elaborated:

> The duty to provide unbundled network
> elements on 'terms, and conditions
> that are just, reasonable and
> nondiscriminatory' means, at a minimum,
> that whatever those terms and
> conditions are, they must be offered
> equally to all requesting carriers, and
> where applicable, they must be equal
> to the terms and conditions under which
> the [ILEC] provisions such elements to
> itself.

See Local Competition Order, ¶¶ 218, 315. Applied here, a plain reading of the "nondiscrimination" provision, and more particularly, the FCC's authoritative interpretation thereof, requires a comparison between (i) the loop conditioning functions that Ameritech performs "for itself" to better serve its own retail customers, and (ii) the loop conditioning that Ameritech performs at the request of individual CLECs so that they too can provide services to their retail customers. See id., ¶ 315.

How, then, did the ICC reach the conclusion that Ameritech must treat its own *retail customers* the same as it treats itself and CLECs? The ICC did not directly state that the Act, or its regulations, require Ameritech to treat CLECs in the same manner as its retail customers. It took a more elliptical route. First, it prefaced that "as a general proposition, UNEs and retail services *may* be comparable." ICC Order, at 96 (emphasis added). Then the ICC determined that, in the context of loop

conditioning, CLECs and retail customers are comparable, or as the ICC stated, "loop conditioning for CLECs has a retail analogue." On this second step, the Commission found:

> The activities associated with loop conditioning, e.g: removal of bridged taps and load coils, must be conducted in order to provision both ISDN and DSL services. Loop conditioning performed in conjunction with the provisioning of ISDN services by Ameritech is the retail analogue of loop conditioning performed in conjunction with the provisioning of DSL capable loops to CLECs. Hence, there is little difference between the provisioning of ISDN services and DSL capable loops.

ICC Order, p. 96. Thus, the ICC held, if implicitly, that since Ameritech's loop conditioning for CLECs is functionally comparable to its conditioning for its own retail customers, federal law requires equal treatment.

Both steps of the ICC's analysis require a closer look. First, the FCC has made clear that, as a general rule, "the ordering of and provisioning of unbundled network elements" have "no retail analogue." Application of Ameritech Michigan Pursuant to Section 271 of the Communications Act of 1934, 12 FCC Rcd 20,543, ¶ 141 (Aug. 19, 1997). In setting out its contrary premise – that, "as a general proposition, UNEs and retail service may be comparable" – the ICC relied on the FCC's New York 271 Order. See Application of Bell Atlantic New York for

<u>Authorization Under Section 271 of the Communications Act to Provide In Region, InterLATA Service in the State of New York</u>, CC Docket 99-925, FCC-99-404, 15 FCC Rcd. 3953 (Dec. 22, 1999). In that Order, the FCC indeed found that the plaintiffs had demonstrated a "retail analogue" for the provision of unbundled loops. *But*, the FCC made clear that its holding was cabined by the unique circumstances presented in that case:

> As noted above, in the past we have evaluated whether an [ILEC] is meeting its nondiscrimination obligation with respect to loops by examining whether loops are provided in a fashion that provides an efficient competitor a meaningful opportunity to compete. In this application, however, we note that the New York Commission adopted a retail analogue for new unbundled loops, and Bell Atlantic submitted accompanying data with which we can conduct a direct parity comparison. Because this retail analogue was developed as a result of the rigorous collaborative process described above, we find this means of comparison to be reasonable *in this instance*.

<u>Id.</u>, ¶ 279 (emphasis added). If anything, then, the <u>New York 271 Order</u> illustrates that while UNEs and retail service *may* be comparable, such a comparison is the rare exception, and not, as the ICC characterized it, a "general proposition." Further, since no "rigorous collaborative process" occurred in this case, the exception carved out by the Order has no application here.

Proceeding to the Commission's second step, even if

provisioning functions for CLECs may, in some circumstances, be comparable to similar functions for retail customers, loop conditioning is not one of them. The ICC found that conditioning a loop for a CLEC was analogous to conditioning a loop for a retail customer because the actual, physical work of "conditioning" is the same in both circumstances. See ICC Order, p. 96. This comparison, while appealing in its simplicity, overlooks the touchstone distinction between CLECs and an ILEC's retail customers. Unlike CLECs, which lease parts of an ILEC's network in order to provide service to their customers, an ILEC's retail customers purchase finished end-to-end services directly from Ameritech. The Sixth Circuit, in the only other decision this Court has found addressing the issues posed here, explained the significance of the distinction:

> [An ILEC] does not provide customers access to disaggregating or conditioning functions but performs those tasks *for itself* when it deems such alterations to existing loops beneficial in order to serve its customers better. In contrast, [an ILEC] must provide these services to [a CLEC] essentially on demand when [the ILEC's] network does not serve [the CLEC's] interest in competing with [the ILEC]. And [the CLEC] will, when the service is complete, obtain leasehold interests in the conditioned loops, while customers obtain no such interest; [the ILEC] retains the right to alter the elements of loops serving customers at its

discretion.

<u>Michigan Bell</u>, 305 F.3d at 592. (emphasis in original). In short, because retail customers do not lease network elements, but instead buy services provided by Ameritech over its own existing network, those customers are not similarly situated with CLECs, and it is therefore not surprising that federal law does not demand like treatment.

We now return to the proper comparison for discrimination purposes under the Act. On that front, the ICC did not find, and defendants do not now argue, that Ameritech fails to treat itself and CLECs on a competitively neutral basis. Ameritech bears the entire cost of loop conditioning up front, just as the requesting CLEC must bear the cost of conditioning up front. Like Ameritech, then, each CLEC can choose whether to pass the cost along to a specific customer, or to spread that cost among all its customers. The ICC seemingly recognized this as the appropriate analogy, but was unsatisfied with its application to the situation before it:

> Ameritech would have the Commission believe that so long as Ameritech provides UNEs to all CLECs, itself, and its affiliates on the same terms, it does not matter how Ameritech treats and recovers its costs from its retail end users for the same activity. This position can not be sustained

> since surely Congress did not
> intend, in enacting the [Act],
> to allow ILECs to structure their
> rates so that end users would
> always find a particular service to
> be cheaper if taken from an ILEC
> than an alternative provider.

ICC Order, at 97. The ICC's determination that retail customers routinely find services requiring loop conditioning, such as DSL, to be cheaper if provided by Ameritech than if offered by a competing CLEC finds some traction in the administrative record. Witnesses for several emerging CLECs testified that their respective customer bases, mere fractions of Ameritech's, do not afford them the luxury of spreading their up-front loop conditioning charges over customers and over time. These CLECs, effectively forced to pass on up-front charges directly to their requesting retail customers, often lose those customers who find a more palatable arrangement with Ameritech.

While the court is receptive to these market realities, and the potential problems they pose for meaningful competition, the inequity with which the ICC was concerned is not properly remedied by an expansion of the FCC's non-discrimination framework beyond its interpretive limits. But, our holding today is a narrow one. We conclude only that Ameritech does not run afoul of the TCA's non-discrimination provision by charging CLECs an up-front charge for conditioning and declining to do the same

for its retail customers. Thus, the ICC Order is reversed only insofar as the ICC's finding of discrimination depended upon the faulty premise that, as a matter of law, Ameritech is required to treat CLECs and its own retail customers in the same manner with respect to its recovery of loop conditioning costs.

C. **Definition of "Available" For Purposes of Network Facility Access**

Prior to issuance of the ICC Order, Ameritech defined a facility as "available" – a facility for which Ameritech must provide requesting CLECs unbundled access – if it was "physically connected" to Ameritech's network and "easily called into service." ICC Order, at 13, 20. The ICC viewed this definition as too restrictive and ordered instead this definition: a facility is "available" if it "is located in an area presently served by Ameritech." Id., at 21. The Commission's definition applies uniformly to CLECs, Ameritech's affiliates, and Ameritech's retail customers. Id.

Ameritech does not argue that the ICC's definition of "available," on its face, violates federal law. Instead, Ameritech avers that the ICC's definition violates federal law "to the extent that it may require Ameritech to construct new facilities to provide a CLEC with an unbundled loop where no loop currently exists." Ameritech Br., at 21.

Irrespective of its merits, Ameritech's argument must fail because it does not present this court with a justiciable "case or controversy" under Article III of the Constitution. See Preiser v. Newkirk, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). Because federal courts are not empowered to issue "advisory opinions," the court's "judgments must resolve 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" Id. (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937)).

To satisfy Article III's "case or controversy" requirement, a plaintiff must allege: (i) an actual or imminent injury, (ii) fairly traceable to the defendant's conduct, that (iii) a favorable federal court decision likely would redress or remedy. See United States v. 5 S. 351 Tuthill Road, 233 F.3d 1017, 1022 (7th Cir. 2000). Here, Ameritech does not get past the first requirement. Plainly, Ameritech does not allege that the ICC *has* interpreted its definition of "available" to require Ameritech to build any new facilities, but only that the ICC *might* do so *if* a CLEC made such a request. At present, then, Ameritech's alleged injury is an abstract hypothetical, dependent upon a chain of "what if's" which may never materialize. Without

a concrete injury or, at least, the immediate threat of injury, Ameritech's argument does not present the Court with a justiciable "case or controversy." See generally Wisconsin's Environmental Decade, Inc. v. State Bar of Wisconsin, 747 F.2d 407, 410-12 (7th Cir. 1984). Accordingly, it is not ripe for this court's review.[11]

### D. Price Quote Requirement for Special Construction

The ICC, in its Order, required Ameritech to amend its special construction policies to provide written notice to customers of the amount of special construction charges, if any, within 48 hours of submission of a loop order. See ICC Order, at 25. Ameritech objects to this requirement on two fronts: first, that it was imposed without affording Ameritech due process of law, and second, that the requirement lacks sufficient evidentiary support.

We begin with Ameritech's due process argument. Ameritech contends that no party to the ICC proceedings mentioned a 48-hour

---

[11] Parenthetically, the court notes its confidence in the ICC's familiarity with the requirements of federal law on this issue. The ICC Order states that "the evidence presented indicates that the CLECs have not sought access to a new or superior network, but only access to the network that Ameritech presently owns and manages . . ." ICC Order, at 20. Indeed, Defendants (again, the ICC Commissioners themselves) represented to this court that "the ICC's Order does not require Ameritech to construct network elements for the sole purpose of unbundling those elements for CLECs." Defs.' Br., at 17.

price quote requirement, or any other temporal price quote requirement, in any of the record testimony or in the post-hearing briefs. It claims that it was first put on notice of the possibility of a 48-hour price quote rule when it appeared in the Hearing Examiner's Proposed Order. Ameritech objected to the requirement in its briefs submitted following the Proposed Order, but since the evidentiary record was closed prior to entry of that order, Ameritech was not given an opportunity to present evidence regarding a price quote interval. Against this, defendants argue that Ameritech was put on notice that a price quote timeframe was within the scope of the ICC's investigation. Defendants cite numerous excerpts of CLEC and Staff witness testimony which addressed the detrimental effects of Ameritech's inconsistent practices regarding the need for special construction, the price for special construction, and the timeframe within which Ameritech communicated the special construction prices to CLECs.

On this record, Ameritech alleges that it was denied sufficient notice and an opportunity to present evidence on the 48-hour requirement, and was thus denied procedural due process. The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives "any person of life, liberty, or property, without due process of law." U.S. Const., Amend. XIV,

§ 1. It is (or should be) by now axiomatic that this language calls for two separate showings to establish a procedural due process claim: (i) deprivation of a constitutionally protected liberty or property interest, and (ii) denial of adequate procedural protections. See <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Inexplicably, Ameritech *and* Defendants fail to even mention, let alone present argument on, the first part of the analysis. Instead, the parties seemingly assume that the ICC's decision *does* require due process, and thus jump right into step two – whether that process was afforded. However, any constitutional restraint on the ICC's review procedure necessarily depends on whether some interest asserted by Ameritech falls within the Fourteenth Amendment's protection of a property interest.

In <u>Roth</u>, the Supreme Court explained the source and nature of constitutionally cognizable property interests:

> Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

408 U.S. at 577. In seeking to demonstrate a protected property

interest, an individual must have more than "an abstract need or desire for it" or "a unilateral expectation of it." Rather, one must possess "a legitimate claim of entitlement." _Id._

Here, Ameritech does not enjoy a right, or even an understanding loosely tethered to some law, that it may notify CLECs regarding the necessity for special construction on its own timetable. Quite the contrary, determinations regarding Ameritech's special construction policies, including its temporal aspects, fall well within the broad discretion of the ICC. _See_, _e.g._, 47 U.S.C. § 253(b) ("Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis . . . requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."); _see also_ _id._ §§ 251, 252 (similar provisions preserving significant state regulatory authority). This almost unfettered administrative discretion forecloses any legitimate claim of entitlement. At best, Ameritech had a "unilateral expectation" that its policies would continue. But this is of no Constitutional moment.

To the extent Ameritech understood that the process afforded by the ICC _itself_ created a protected property interest, that route gets it no further. The Seventh Circuit has cautioned

litigants that "[o]ne cannot have a 'property interest' . . . in mere procedures" because:

> [p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a claim of entitlement . . . The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right.

Doe v. Milwaukee County, 903 F.2d 499, 503 (7th Cir. 1990) (quoting Olim v. Wakinekona, 461 U.S. 238, 250-51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)). It appears, then, that even had Ameritech made an effort to identify the claim of entitlement that a procedural due process claim requires, it would have been unable to do so.

Moreover, even assuming the existence of a protectable property right, Ameritech has not shown that it did not receive the process it was due. See generally Matthews v. Eldridge, 424 U.S. 39, 333-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (Fundamental requirements of due process are notice and an opportunity to heard "at a meaningful time and in a meaningful manner."). The undisputed facts demonstrate that the ICC held three days of hearings during which Ameritech had ample opportunity to present evidence and to cross-examine adverse witnesses who testified

that its special construction policies were rife with inconsistencies and delay. Following issuance of the Commission Hearing Examiner's Proposed Order, Ameritech was given the opportunity, which it took, to object to the Commission's price quote requirement. Finally, the ICC issued a final order which amply sets out the evidentiary basis for the new requirement.

Ultimately, the crux of Ameritech's challenge is not that it did not have ample notice that its special construction policies, including timing issues, were of concern to the ICC, but rather that it was not afforded adequate notice of a particular remedy that the ICC adopted. However, *constitutional* notice does not necessarily require notice of a particular outcome. Notice is sufficient, as here, as long as it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed.2d 865 (1950). Accordingly, Ameritech's due process claim must fail.

Alternatively, Ameritech alleges that the ICC's decision lacks a sufficient evidentiary basis. This second attack also misses the mark because Ameritech identifies no federal requirement that the ICC's 48-hour price quote requirement purportedly violates. Absent a claimed encroachment upon federal

law, we do not engage in a general review of the ICC Order's evidentiary underpinnings. Since the scope of our review is limited to a determination of whether the Order violates federal law (see Illinois Bell Tel. Co. v. WorldCom Tech., Inc., 179 F.3d 566, 572 (7th Cir. 1999) ("[O]ur task is to examine the ICC order . . . [only] to see whether its decision violates federal law, as set out in the Act or in the FCC's interpretation.")), we decline to reach Ameritech's evidentiary argument.

## CONCLUSION

For the reasons set forth above, Ameritech's motion is granted in part, and denied in part.

The court hereby reverses the ICC Order only insofar as the ICC's finding of discrimination depends on the faulty premise that, as a matter of federal law, Ameritech is required to treat CLECs and its own retail customers in the same manner with respect to Ameritech's recovery of loop conditioning costs. With regard to the other challenged portions of the ICC Order, specifically, (i) the ICC's determination that Ameritech is not entitled to recover special construction charges for installing new facilities to provide unbundled loops served by integrated systems, (ii) the ICC's ordering of a new definition of "available" for purposes of providing a CLEC with a requested UNE, and (iii) the ICC's imposition of a new 48-hour price quote

requirement for special construction work, the Order is affirmed.

Accordingly, the court hereby enjoins enforcement of the ICC Order only insofar as it requires, in reliance on its flawed interpretation of the Act's nondiscrimination requirement, that Ameritech levy special construction charges on its own retail customers, whose requested services require loop conditioning, as a necessary prerequisite to imposing special construction charges on CLECs who request loop conditioning to serve their own customers.

DATE:    November 18, 2003

ENTER:    _____
          John F. Grady, United States District Judge